Alfred SOLE et al., Plaintiffs,

v.

GRAND JURORS OF the STATE OF NEW JERSEY FOR the COUNTIES OF PASSAIC AND BERGEN, et al., Defendants.

Civ. A. No. 74–1446.

United States District Court,
D. New Jersey.

May 5, 1975.

**1324**

Rosenberg & Waldman by Richard K. Rosenberg, Glen Rock, N. J., for plaintiff Muskat.

Stanley C. Van Ness, Public Defender by George Tosi, First Asst. Deputy Public Defender, for plaintiff Rose.

Miles R. Feinstein, Passaic, N. J., for plaintiff Sole.

William J. De Marco, Wayne, N. J., for plaintiff Pope.

Joseph D. J. Gourley, Passaic County Prosecutor by John Goceljak, Asst. Prosecutor, for defendants Grand Jurors, Gourley and Woodcock.

William F. Hyland, Atty. Gen. of New Jersey by Solomon Rosengarten, Deputy Atty. Gen., for the State of New Jersey and Governor of New Jersey.

Before GIBBONS, Circuit Judge, and BIUNNO and STERN, District Judges.

## OPINION

STERN, District Judge.

Plaintiffs Alfred Sole, Andrew Muskat, Katherine Victoria Pope and Joseph Rose filed this federal action for injunctive and declaratory relief against the defendants 18 months after their indictment in the Superior Court of New Jersey for the crimes of fornication, private lewdness, carnal indecency and conspiracy.[1] The defendants are Joseph D. J. Gourley, Passaic County Prosecutor; Joseph Woodcock, Bergen County Prosecutor; Brendan T. Byrne, Governor of New Jersey; the Grand Jurors of the State of New Jersey of the Counties of Passaic and Bergen, and the State of New Jersey.

The state indictments were based on plaintiffs' participation as the actors (Pope and Rose), the producer (Muskat), and the director (Sole) of the motion picture "Deep Sleep," a film which depicts acts of sexual intercourse in which Rose and Pope allegedly engaged

---

1. On February 22, 1973, the Passaic County Grand Jury returned several indictments against the plaintiffs in this action. Indictment No. 236–73 charged plaintiffs Sole and Pope with carnal indecency, in violation of N.J.S.A. 2A:115–1. Sole and Pope were charged in Indictment No. 235–73 with fornication, in violation of N.J.S.A. 2A:110–1. All plaintiffs were charged in Indictment No. 237–73 with conspiracy to commit fornication contrary to the provisions of N.J.S.A. 2A:98–1 and N.J.S.A. 2A:98–2. Indictment No. 238–73 charged all plaintiffs with conspiracy to commit lewdness and carnal inde-

cency. Plaintiff Sole was also charged in Indictment No. 234–73 with permitting a building to be used for lewdness and assignation, in violation of N.J.S.A. 2A:133–2(b). Plaintiff Joseph Rose was charged in Bergen County Indictment No. 246–73 with fornication, contrary to the provisions of N.J.S.A. 2A:110–1, and Bergen County Indictment No. 274–73 charged Rose with carnal indecency, in violation of N.J.S.A. 2A:115–1. On March 8, 1973, the Assignment Judge of Bergen County ordered the indictments transferred to Passaic County.

for purposes of the filming. When the film was exhibited at a movie theater located in Passaic County, it was seized as evidence pursuant to a search warrant obtained in Superior Court by defendant Gourley, and the state prosecution for the state crimes ensued.

After the filing of these indictments on February 22, 1973, plaintiffs sought dismissal of the indictments in pretrial motions in Superior Court. These motions, brought in May of 1973 by all the federal plaintiffs, attacked the statutes prohibiting fornication and public lewdness as vague and overbroad, as unconstitutional on their face, and as unconstitutional as applied. In addition to alleging these defects in the statutes, plaintiffs also alleged in the state forum that the prosecution was itself constitutionally defective because the Passaic County Prosecutor had brought the indictments to suppress plaintiffs' exercise of their First Amendment rights. The heart of plaintiffs' motions in state court was that their prosecution under the statutes prohibiting fornication and lewdness was a sham, to which the prosecutor had resorted only because the United States Constitution precluded his use of the state obscenity statute to suppress the film itself.[2]

The Superior Court heard and denied all motions to dismiss the indictments.[3] The Appellate Division of the Superior Court denied plaintiffs leave to appeal.

The Supreme Court of New Jersey denied review.[4]

It was only following all of this preliminary state court litigation that plaintiffs, 18 months after they were indicted and just several weeks before trial was to begin, commenced suit here on September 17, 1974, alleging the unconstitutionality of N.J.S.A. 2A:110–1[5] and 2A:115–1[6] on the grounds of vagueness, overbreadth, and unconstitutional application in the pending state criminal proceeding. These were the identical federal claims previously presented by plaintiffs to the state trial judge.

On November 25, 1974 this three-judge court was constituted by order of Chief Judge Seitz of the Court of Appeals for this Circuit. Discovery having been completed, defendants moved to dismiss the complaint for failure to state a claim upon which relief can be granted. F.R.Civ.P. 12(b)(6). Pursuant to Rule 65 of the Federal Rules of Civil Procedure, the claims for injunctive relief were consolidated with the trial on the merits. The motion to dismiss was taken under advisement by the Court on January 29, 1975.

It is clear that this Court has jurisdiction over this lawsuit, 42 U.S.C. § 1983, 28 U.S.C. § 1343(3), and the State does not dispute that issue. Of greater import is the question whether this Court should exercise that jurisdiction, or whether it should instead defer to the

---

2. The constitutionality of the New Jersey anti-obscenity statute, N.J.S.A. 2A:115–1.1 (Supp.1973) was uncertain at the time the instant plaintiffs were indicted. The anti-obscenity statute was declared unconstitutional in *Hamar Theatres, Inc. v. Cryan*, 365 F.Supp. 1312 (D.N.J.1973) (three-judge court), vacated and remanded on other grounds, 419 U.S. 1085, 95 S.Ct. 670, 42 L. Ed.2d 675 (1974). Subsequently the New Jersey Supreme Court construed the statute so that the constitutional defects found in *Hamar* no longer existed. *State v. DeSantis*, 65 N.J. 462, 323 A.2d 489 (1974). On February 25, 1975, this Court dismissed the *Hamar* complaint as moot.

3. Amended Complaint, paragraph 21, *infra*, n. 13. *See* Complaint Exhibits E, F, K and M.

4. Amended Complaint, paragraph 22, *infra*, n. 13.

5. N.J.S.A. 2A:110–1. Fornication
   Any person who commits fornication is guilty of a misdemeanor, and shall be punished by a fine of not more than $50, or by imprisonment for not more than 6 months, or both.

6. N.J.S.A. 2A:115–1. Lewdness or indecency
   Any person who commits open lewdness or a notorious act of public indecency, grossly scandalous and tending to debauch the morals and manners of the people, or in private commits an act of lewdness or carnal indecency with another, grossly scandalous and tending to debauch the morals and manners of the people, is guilty of a misdemeanor.

state judicial process for reasons of equity, comity and federalism.

Historically, the lower federal courts lacked jurisdiction to vindicate rights arising under the Constitution and federal laws. The state courts were the only forum in which a litigant could seek relief against the enforcement of a state statute which infringed on his federal constitutional rights.

The wave of nationalism following the Civil War brought with it congressional investiture of the federal judiciary with enormously increased power.

> " . . . Congress gave the federal courts the vast range of power which had lain dormant in the Constitution since 1789. These courts ceased to be restricted tribunals of fair dealing between citizens of different states and became the *primary* and powerful reliances for vindicating every right given by the Constitution, the laws, and treaties of the United States." Frankfurther & Landis, The Business of the Supreme Court: A Study in the Federal Judicial System, 65.

Zwickler v. Koota, 389 U.S. 241, 247, 88 S.Ct. 391, 395, 19 L.Ed.2d 444 (1967). (Emphasis in original.)

■ The obligation of the state courts, under Article VI of the Constitution, to vindicate rights guaranteed by the federal constitution, laws and treaties, was not discharged by the acquisition of new power by the federal courts. State courts remain, as before, fully capable of determining issues arising under the federal constitution.

Our national judicial system thus consists of two co-equal structures:

> " . . . These courts do not belong to the same system, so far as their jurisdiction is concurrent; and although

they co-exist in the same space, they are independent, and have no common superior." Covell v. Heyman, 111 U. S. 176, 182, 4 S.Ct. 355, 28 L.Ed. 390 (1884).

Jennings v. Boenning & Co., 482 F.2d 1128, 1132 (3rd Cir. 1973), cert. denied, 414 U.S. 1025, 94 S.Ct. 450, 38 L.Ed.2d 316 (1973). Of course, to the extent that state courts construe the Constitution, laws and treaties of the United States, they share with the federal courts the obligation to follow authoritative federal construction of the supreme law of the land.

■ A litigant who alleges a case or controversy, within the purview of Article III, is therefore initially presented with the luxury of a choice of forum, federal or state, in which to present his constitutional claims for resolution.

A plaintiff's right to choose his forum is substantially diminished, however, when at the time he seeks redress in federal court he is also in the process of litigating the identical federal claims before a state tribunal. Where the federal plaintiff is enmeshed in a state-initiated proceeding, such as a state prosecution, and then seeks relief in federal court for violations of his federal constitutional rights by state agents or statutes, the federal court may decline to exercise jurisdiction on the grounds of the traditional principles of equity, comity and federalism. Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1970).

■ This policy, that federal courts do not interfere with state criminal proceedings,[7] flows not only from the basic doctrine of equitable jurisprudence that courts of equity should not act when the moving party has an adequate remedy at law, but also from "an even more vital consideration," the no-

---

7. The policy of non-interference in state criminal proceedings applies equally to state proceedings which, although nominally civil, are in aid of and closely related to state criminal statutes. Huffman v. Pursue Ltd., — U.S. —, 95 S.Ct. 1200, 43 L.Ed. 482 (1975).

A similar policy governs the propriety of federal equitable intervention in pending court-martial proceedings. Schlesinger v. Councilman, — U.S. —, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

tion of comity under our federal system of government:

> . . . that is, a proper respect for state functions, a recognition of the fact that the entire country is made up of a Union of separate state governments, and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

401 U.S. at 44, 91 S.Ct. at 750.

This concept of federalism "does not mean blind deference to 'States' Rights'," but rather a recognition of "the legitimate interests of both State and National Governments, . . . in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Id.*

■ A state's enforcement of its criminal laws is a major vehicle for the effectuation of its substantive policies.[8] Federal interference with a pending state judicial proceeding, whether by injunctive or declaratory relief,[9] not only thwarts the state's efforts to protect the very interests which underlie its criminal laws, but results in duplicative proceedings and may be interpreted as dis-

trust of the state court system's ability or willingness to enforce constitutional principles.[10]

■ This is not to say that the federal forum is absolutely unavailable to litigants in ongoing state prosecutions. The fundamental policy against federal interference with state criminal prosecutions may be outweighed by the federal litigant's demonstration of irreparable injury and an inadequate remedy at state law, the traditional predicates for equitable relief. However, the litigant who seeks to establish this quasi-jurisdictional basis for federal equitable relief must meet the strict requirements of the narrow *Younger* exception:

> . . . [A] federal plaintiff must show *manifest bad faith and injury that is great, immediate, and irreparable, constituting harassment of the plaintiff in the exercise of his constitutional rights, and resulting in a deprivation of meaningful access to the state courts.*

Allee v. Medrano, 416 U.S. 802, at 836, 94 S.Ct. 2191, at 2210, 40 L.Ed.2d 566 (1974). (Separate opinion of Burger, C. J.) (Emphasis added)

■ The injury associated with every criminal prosecution is insufficient to breach the high barriers of *Younger.* A litigant must show deliberate action by the prosecutorial authorities, in bad

---

**8.** A State's decision to classify conduct as criminal provides some indication of the importance it has ascribed to prompt and unencumbered enforcement of its law.
Younger v. Harris, *supra*, 401 U.S. at 55, n. 2, 91 S.Ct. at 757 (concurring opinion of Stewart, J.)

**9.** The applicability of *Younger* to a federal plaintiff's request for declaratory relief is succinctly summarized in Steffel v. Thompson, 415 U.S. 452, 461, 94 S.Ct. 1209, 1216, 39 L.Ed.2d 505 (1974) (footnote omitted): In Samuels v. Mackell [401 U.S. 66, 91 S. Ct. 764, 27 L.Ed.2d 688 (1971)] the Court also found that the same [*Younger*] principles ordinarily would be flouted by issuance of a federal declaratory judgment when a state proceeding was pending, since the intrusive effect of declaratory relief "will result in precisely the same in-

terference with and disruption of state proceedings that the long-standing policy limiting injunctions was designed to avoid." 401 U.S. at 72 [91 S.Ct., at 768]. We therefore held in *Samuels* that, "in cases where the state criminal prosecution was begun prior to the federal suit, the same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment. . . ." 401 U.S. at 73 [91 S.Ct. at 768].

**10.** Huffman v. Pursue, Ltd., —— U.S. ——, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975). *See* Aldisert, Judicial Expansion of Federal Jurisdiction, 1973 Ariz.St.L.J. 557 (1973) for a discussion of the effect of the contemporary expansion of federal jurisdiction on the public image of state courts.

faith, which has deprived him of a reasonable and adequate opportunity to make application in the state courts for vindication of his constitutional rights.

When such an individual, deprived of meaningful access to the state courts, faces irreparable injury to constitutional rights of great and immediate magnitude, either in the immediate suit or in the substantial likelihood of "repeated prosecutions to which he will be subjected," Younger v. Harris, supra, 401 U.S., at 49 [91 S.Ct. 746, at 753], and the injury demands prompt relief, federal courts are not prevented by considerations of comity from granting the extraordinary remedy of interference in pending state criminal prosecutions.

Allee v. Medrano, *supra*, 416 U.S. at 835, 94 S.Ct. at 2210 (1974) (Separate opinion of Burger, C. J.).

Absent such circumstances,[11] although the federal court has jurisdiction over the controversy, it will decline to exercise that jurisdiction and will require the federal plaintiff to present his federal claims in the pending state proceeding.

■ Just as the existence of a prior state proceeding may foreclose a litigant from the federal forum, so may his recourse to a federal court fail if he attempts to assert his federal rights there prematurely.

■ The jurisdiction of federal courts is limited by Article III of the Constitution to "cases" and "controversies." In order to invoke that jurisdiction, an individual must do more than claim that there exists, for example, a state statute which chills the exercise of his federal constitutional rights. *Younger, supra*, 401 U.S. at 52–53, 91 S.Ct. 746; Allee v. Medrano, *supra*, 416 U.S. at 827, 94 S.Ct. 2191 (separate opinion of Burger, C. J.).

Plaintiffs in the federal courts "must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction." Linda R. S. v. Richard D., 410 U.S. 614, 617 [93 S. Ct. 1146, 1148, 35 L.Ed.2d 536] (1973). There must be a "personal stake in the outcome" such as to "assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204 [82 S.Ct. 691, 703, 7 L.Ed.2d 663] (1962). Nor is the principle different where statutory issues are raised. Cf. United States v. SCRAP, 412 U.S. 669, 687 [93 S.Ct. 2405, 2415, 37 L.Ed.2d 254] (1973). Abstract injury is not enough. It must be alleged that the plaintiff "has sustained or is immediately in danger of sustaining some direct injury" as the result of the challenged statute or official conduct. Massachusetts v. Mellon, 262 U.S. 447, 448 [43 S.Ct. 597, 601, 67 L.Ed. 1078] (1923). The

---

11. Aside from the "bad faith" prosecution exception developed in *Younger*, the Supreme Court has also indicated other situations which may permit federal injunctive interference in state criminal proceedings:

There may, of course, be extraordinary circumstances in which the necessary irreparable injury can be shown even in the absence of the usual prerequisites of bad faith and harassment. For example, as long ago as the *Buck* case, [Watson v. Buck, 313 U.S. 387, 61 S.Ct. 962, 85 L.Ed. 1416 (1941)], we indicated:

"It is, of course conceivable that a statute might be flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." 313 U.S., at 402 [61 S.Ct., at 967].

Other unusual situations calling for federal intervention might also arise, but there is no point in our attempting now to specify what they might be.

*Younger, supra*, 401 U.S. at 53–54, 91 S.Ct. 755.

The "extraordinary circumstance" exception was invoked in Helfant v. Kugler, 500 F.2d 1188 (3rd Cir. 1974), vacated and remanded — U.S. —, 95 S.Ct. 1524, 44 L.Ed.2d 15 (1975). The Supreme Court found the exception inapplicable to the facts of that case.

injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." Golden v. Zwickler, 394 U.S. 103, 109–110 [89 S.Ct. 956, 960, 22 L.Ed.2d 113] (1969); Maryland Casualty Co. v. Pacific Coal & Oil Co., 312 U.S. 270, 273 [61 S.Ct. 510, 512, 85 L.Ed. 826] (1941); United Public Workers v. Mitchell, 330 U.S. 75, 89–91 [67 S.Ct. 556, 564–565, 91 L.Ed. 754] (1947). O'Shea v. Littleton, 414 U.S. 488, 493–494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).

Absent a continuing, actual threat of state prosecution against the federal plaintiff, the "case or controversy" requirement precludes resolution of his constitutional claims in the federal forum.

It is the unfortunate result of the intersection of the requirements of Article III and the barriers of Younger that access to the federal forum may be illusory, at best, to an individual contemplating the commission of an act which he believes federally protected, but which is prohibited by state law. If he engages in that conduct and is thereafter arrested and prosecuted under the state statute, the principles of equity, comity and federalism enunciated in *Younger* will require him to present his constitutional claims in the state forum, absent extraordinary circumstances. On the other hand, if he foregoes that conduct and instead seeks access to the federal forum to litigate the issue of whether the state statute violates his federally-guaranteed rights by proscribing conduct protected by the federal Constitution, he is likely to be denied a federal forum for want of a case or controversy, or for lack of standing. O'Shea v. Littleton, *supra;* Steffel v. Thompson, 415 U.S. 452, 458–460, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974).[12]

Thus, under the governing Supreme Court decisions, the portals of the federal forum remain open to a plaintiff who has a case or controversy turning on a claim of the unconstitutionality of a state statute, but only until such time as he is brought, or chooses to go, before a state court on that constitutional claim.

In the case at bar the federal plaintiffs did not choose to file a federal suit challenging these state statutes before making the film. According to their own complaint, they proceeded instead to challenge the statute by their conduct, and did not seek a federal forum until after they presented and lost the identical claims in state court, some 18 months after the state court prosecution had begun.

The existence of a pending criminal prosecution against the instant plaintiffs under the authority of the challenged state statutes is thus beyond dispute. Under the by now well-established principles of equity, comity and federalism enunciated in *Younger, supra,* plaintiffs may not invoke the federal forum unless they can demonstrate that kind of "extraordinary circumstances" which would permit this Court to interfere in the pending criminal case within the state court system.

12. *Steffel* involved several handbillers. Although the court considered the federal plaintiff, who had not been arrested, to have alleged an actual controversy with the state agents without imputation to him of a companion's pending state criminal proceeding for *Younger* purposes. It has not yet defined the degree of joint activity and common interest which permits the imputation of a state proceeding for *Younger* purposes to a federal plaintiff not charged in the state prosecution. Allee v. Medrano, *supra,* 416 U.S. at 832, n. 8, 94 S.Ct. 2191 (separate opinion of Burger, C. J.)

It also has not been authoritatively determined what effect, if any, a state criminal proceeding instituted after the filing of a federal complaint has on the propriety of the federal court's exercise of jurisdiction over the action. Steffel v. Thompson, *supra,* 415 U.S. at 480, 94 S.Ct. 1209. (Concurring opinion of Rehnquist, J.) *Compare* the majority and dissenting opinions in Salem Inn, Inc. v. Frank, 501 F.2d 18 (2nd Cir. 1974), prob. juris. noted 419 U.S. 1119, 95 S.Ct. 801, 42 L.Ed.2d 819 (1975).

In this case, however, we need not reach the *Younger* issue, for plaintiffs voluntarily submitted to the state trial court the precise legal issues they seek to raise here again. Moreover, after the initial adverse rulings against them at the state trial level, these plaintiffs unsuccessfully sought permission to appeal that tribunals interlocutory decision to the Appellate Division. They then petitioned the New Jersey Supreme Court for review of the identical legal and factual issues which they now alleged in Federal District Court, which was denied.[13]

Although the judicial determinations of the New Jersey courts cannot be accorded *res judicata* or collateral estoppel effect here, because there has been rendered no judgment that is final under New Jersey Law,[14] the principles of equity, comity and federalism preclude our "review" of interlocutory decisions of state courts on the very issues that plaintiffs initially elected to present the state courts for adjudication.

This is not a case of a federal plaintiff who, having been brought before a state court tribunal, immediately sought to invoke the federal forum to vindicate his federal rights by offering to demonstrate that, because of extraordinary circumstances, he could not obtain relief before the state tribunal. These plaintiffs were well content to present their federal claims to the state tribunal, and continued to be so and to do so for many months, until, dissatisfied with the initial results obtained there, they decided to seek a different forum here. . This they may not do. If there had been extraordinary circumstances which made an adequate remedy at law within the state court system impossible or improbable, plaintiffs should have made them known at the first opportunity and sought their federal relief then. Having elected instead to seek their relief from the state court, plaintiffs simply will not now be heard here.

In effect, plaintiffs have attempted to remove their criminal prosecution laterally to federal district court, rather than following state appellate procedure, culminating, if necessary in an appeal to the United States Supreme Court,[15]

13. "21. Since the indictments were returned in or about March, 1973, plaintiffs have, in the Courts of the State of New Jersey, attempted to cause the indictments to be dismissed for reasons, *inter alia*, akin to the reasons adduced before this court, to wit, that the acts which were alleged to be criminal are protected under Article I, and that the statutes under. which the indictments have been brough [sic] are unconstitutional either on their face or as applied to these facts."

"22. The Law Division of Superior Court of New Jersey denied the application of the plaintiffs, petition for leave to appeal was denied by the Appellate Division of that Court of New Jersey, and finally, the Supreme Court of New Jersey refused to grant these plaintiffs' petition for certification on the issues presented."

Amended Complaint, paragraphs 21 and 22.

14. R. 2:3-1, N.J. Court Rules (1969). *See* Helfant v. Kugler, *supra*, at 1194, n. 4. Cf. Fitzgerald v. Cawley, 368 F.Supp. 677, 679 (S.D.N.Y.1973). For a discussion of the preclusive effect of application of the doctrine of *res judicata* on a litigant's access to a federal trial forum for the vindication of federal rights, *see* Huffman v. Pursue, Ltd., *supra* n. 10, —— U.S. at ——, 95 S.Ct. 1200.

15. 28 U.S.C. § 1257(2). Mr. Justice Brennan noted in *Younger*:

. . . The court below also thought it significant that appellee Harris had raised his constitutional claim in the state courts in a motion to dismiss the indictment and in petitions in the state appellate courts for a writ of prohibition. It was questioned at oral argument whether constitutional issues could properly be raised by the procedures invoked by Harris, and it was suggested that the denial of Harris' motions did not necessarily involve rejection of his constitutional claims. However, even if the California courts had at that interlocutory stage rejected Harris' constitutional arguments, that rejection would not have provided a justification for intervening by the District Court. Harris could have sought direct review of that rejection of his constitutional claims or he could have renewed the claims in requests for instructions, and on direct review of any conviction in the state courts and in this Court. These were the proper modes for presentation and these the proper fo-

and/or a federal petition for a Writ of Habeas Corpus.[16] Federal district courts simply lack jurisdiction to review state court determinations of federal constitutional questions while the matter is still pending before the state trial court.[17]

■ Avoidance of duplicate legal proceedings and sanctions where a single suit would be adequate to protect the rights asserted is in the best interests of both the federal and state court systems.[18]

Accordingly, this Court need not examine the complaint to ascertain wheth-er the allegations are sufficient to establish the "exceptional circumstances" permitting federal intervention in the state court proceedings. Having chosen to litigate their federal claims in the state forum, and having preliminarily lost their cause at the pretrial stage, plaintiffs may not now be heard to claim that the inadequacy of the state forum affords them the right to re-litigate those same federal claims in the federal forum.

This Court therefore declines to exercise its jurisdiction in the instant matter, and the action will be dismissed.[19]

---

rums for consideration of the constitutional issues.

*Younger, supra,* 401 U.S. at 57, n. * 91 S.Ct. at 756 (concurring opinion of Brennan, J.)

16. *See* Thistlethwaite v. City of New York, 497 F.2d 339, 342–343 (2nd Cir. 1974).

17. Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); Tang v. App. Div. of New York Supreme Court, 487 F.2d 138, 141 (2nd Cir. 1973), cert. denied, 416 U.S. 906, 94 S.Ct. 1611, 40 L.Ed.2d 111 (1974); Roy v. Jones, 484 F.2d 96, 98–99 (3rd Cir. 1973).

The instant case graphically illustrates one of the evils of federal intervention when a state court proceeding is not only pending but in progress and close to completion. The state indictments were returned in February, 1973. The state defendants proceeded first to litigate the issues raised here in their pretrial motions at the trial level, and thereafter sought state appellate review of the trial court's interlocutory decisions. Completion of pretrial procedures in state court resulted in the establishment of October 21, 1974 as the date for commencement of trial. On September 17, 1974, plaintiffs launched this federal suit to raise substantially similar claims. The prosecutor, in good faith, consented to hold the state trial in abeyance pending the outcome of the instant suit. The resultant delay in the state proceedings has already been over five months.

It is this type of paralysis of the state courts that *Younger* sought to avoid. As one three-judge court has observed:

If the *Younger* rule did not exist, litigants could use federal court proceedings to paralyze state criminal proceedings. *Pre-trial motions could be litigated in federal court. State procedures could be tested in federal court without the highest* state court having a chance to interpret the relevant statutes. Many issues in a case would have to be litigated repeatedly in different forums.

Wall v. American Optometric Ass'n, Inc., 379 F.Supp. 175, 187 (N.D.Ga.1974), aff'd mem., 419 U.S. 888, 95 S.Ct. 166, 42 L.Ed.2d 134 (1974), rehearing denied 419 U.S. 1061, 95 S.Ct. 648, 42 L.Ed.2d 659 (1974). (Emphasis added) *Cf.* Stefanelli v. Minard, 342 U.S. 117, 123–124, 72 S.Ct. 118, 96 L.Ed. 138 (1951).

18. The delay in the ultimate resolution of a criminal prosecution and the dissipation of judicial resources that result when an action is shuttled between state and federal courts under 28 U.S.C. § 1443 is described in Greenwood v. Peacock, 384 U.S. 808, 832–833, 86 S.Ct. 1800, 16 L.Ed.2d 944 (1966). Absent the *Younger* doctrine, similar disruption would occur if federal interference were permitted in a state criminal proceeding.

19. All discovery was completed prior to the hearing on the defendants' motion to dismiss the complaint for failure to state a claim upon which relief can be granted. At that hearing, the Court informed the litigants of the possibility of converting the Rule 12(b)(6) motion into a Rule 56 summary judgment motion pursuant to F.R.Civ.P. 12(b), and requested counsel to submit any materials outside the pleadings in support of their respective positions.

We have examined at length the filed depositions, affidavits and transcripts, especially the depositions of Prosecutor Gourley and of his First Assistant, John T. Niccollai, and drawing all inferences in favor of plaintiffs, we find that there exists no genuine issue of material fact in dispute concerning the application of the legal doctrine discussed herein. Suffice it to say that plaintiffs have also failed to establish the existence of an inade-

GIBBONS, Circuit Judge (concurring):

I am as disenchanted with the trend of decisions on federal court enforcement of civil rights since Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L. Ed.2d 669 (1970), as are some commentators. *See, e. g.,* B. Wechsler, Federal Courts, State Criminal Law and the First Amendment, 49 N.Y.U.L.Rev. 740 (1974). But we are bound by those decisions. Here we are faced with a pending state criminal prosecution. Thus we cannot grant either injunctive relief, Younger v. Harris, *supra,* or declaratory relief, Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971), unless we can find that the prosecution was "brought in bad faith, with no genuine expectation of conviction." Allee v. Medrano, 416 U.S. 802, 819, 94 S.Ct. 2191, 2202, 40 L.Ed.2d 566 (1974). Since on this record I cannot so find, I agree that we must dismiss the complaint without considering the constitutional challenge to the New Jersey statutes. This limitation on the availability of federal equitable or declaratory remedies does not, of course, suggest any limitation on the power of the Superior Court to grant corresponding remedies in the pending cause, under N.J. Rule 4:52-6, even in the presence of a pending criminal proceeding. *See* Dobbins v. Los Angeles, 195 U.S. 223, 241, 25 S.Ct. 18, 49 L.Ed. 169 (1903); *cf.* Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968). The distinction suggested in Judge's Stern's opinion between those plaintiffs who have not yet violated a statute and who seek federal declaratory relief rather than risk prosecution, and those who violate first and litigate later has much to commend it. *See* Terrace v. Thompson, 263 U.S. 197, 44 S.Ct. 15, 68 L.Ed. 255 (1923); Truax v. Raich, 239 U.S. 33, 36 S.Ct. 7, 60 L. Ed. 131 (1915). But I question whether, if Sole and his companions had

sought declaratory relief in a federal court prior to making their sexually explicit film, a majority of the Supreme Court would find that they had standing to challenge the statutes here in issue in the absence of an actual threat of prosecution by the defendants. *See, e. g.,* Allee v. Medrano, *supra,* 416 U.S. at 826-30, 94 S.Ct. 2191 (Burger, C. J., concurring in part and dissenting in part).

BIUNNO, District Judge (concurring).

At the premiere of Aida in Cairo, in 1871, Radames and Aida were immured in a prison cell beneath the Temple of Isis, where they expired in each other's arms. And they have died again at the end of each of the countless performances of the opera since then.

In every performance of Carmen, since its premiere in Paris in 1875, Jose has stabbed the gypsy girl through the heart just as shouts from the bull-ring signalled Escamillo's victory.

Cascio has stabbed Nedda and Silvio before countless audiences of Pagliacci for more than 80 years.

Jochanaan has been decapitated and his head brought to Salome on a silver platter ever since 1905 in Dresden.

And so in countless theatrical performances, motion pictures, comic strips and books, all manner of violence, crime and depravity have been portrayed.

What distinguishes these killings, poisonings, rapes, seductions and like events from the present case is that they are not real; they are simulated. All the "dead" performers are always found at the footlights to take their curtain calls.

In this case, the performance was real; the acts and conduct recorded on film were actually committed, and the film is photographic evidence of them.

---

quate remedy at state law and of great, immediate and irreparable injury necessary for the requested federal injunctive relief,

whether in the context of the motion to dismiss or the motion for summary judgment.

The claim that the First Amendment shields the participants from prosecution for what they did, is grotesque.

I concur fully in the opinion of the Court.