**UNITED STATES of America**

v.

**Richard A. BARONE.**

**Cr. No. 89–309–01.**

United States District Court, E.D. Pennsylvania.

Dec. 13, 1991.

---

**21.** *Id.*

---

**MEMORANDUM AND ORDER**

SHAPIRO, District Judge.

This court has conducted a factfinding inquiry at the request of the defendant into

whether the government breached its plea agreement with the defendant, Richard Barone, and, if so, to what remedy the defendant is entitled at this time.

The court's inquiry concerned the circumstances surrounding the defendant's plea agreement to federal charges, his testimony in federal court, and his subsequent indictment by the State of New Jersey on prior unrelated offenses. The hearings were initiated by the court after statements by the defendant implying that he was being tried in the State of New Jersey for crimes for which he was immunized by the federal government.

Counsel was appointed by the court for the investigation and presentation of the defendant's claim. The court conducted an *in camera* review of the file of the Federal Bureau of Investigation and called the investigative agents as witnesses. The defendant was afforded the opportunity to call witnesses in support of his claim.

After reviewing post-hearing submissions from defendant and the government, the Court makes the following findings and conclusions.

### FINDINGS OF FACT

1. Richard Barone entered a plea of guilty to two counts of the indictment, pursuant to a written and signed plea agreement, on November 3, 1989.

2. Under the agreement, Mr. Barone promised, *inter alia*, "to be fully debriefed concerning his knowledge of, and participation in, the offense charged in this indictment, and any other crimes about which he has knowledge." Para. 6(b)(1).

3. Under the agreement, Mr. Barone also promised "to testify as a witness ... at any ... trials when called upon to do so by the Government." Para. 6(b)(2).

4. Under the agreement, *inter alia*, the government of the United States promised to "provide Mr. Barone with the opportunity to apply for admission to the federal witness protection program." Para. 6(c)(2)(c).

5. By implication, the government promised in connection with its obligation

under Para. 6(c)(2)(c) of the agreement not to do anything that would cause Mr. Barone to lose the benefit of the Witness Protection Program if he were admitted into it.

6. Under this agreement, the government of the United States also promised to "bring no additional charges against the defendant for criminal conduct related to activity which he has disclosed during proffer sessions with federal agents prior to the entry of his guilty pleas." Para. 6(c)(2)(e).

7. By implication, the government promised in connection with its obligation under Para. 6(c)(2)(e) not to do anything that would cause additional charges to be brought against Mr. Barone by other authorities on the basis of matters he disclosed during any pre-plea proffer and not to facilitate the successful prosecution of such charges.

8. A proffer session was held on or about November 2, 1989, the day trial began against co-defendants Mssrs. Barone and Merlino, and prior to the entry of Mr. Barone's guilty plea in this case. Agent Rochon of the FBI took notes on a yellow legal pad; however, the notes retained in the FBI's case file do not include information about the crimes that Mr. Barone disclosed that evening other than that for which he was currently on trial. However, the communication from Rochon in connection with the proffer to ascertain Barone's eligibility for the witness protection program stated that Barone would provide information, *inter alia*, about the Junior Black Mafia. The authorization to offer Barone an opportunity to apply for the witness protection program specifically referred to his giving information about crimes other than the subject of the guilty plea. A memo to file by Agent Rochon also stated:

AUSA GOLDMAN said additional interviews will be conducted of BARON [sic] in the future concerning this matter and a debriefing will also take place of BARON concerning his knowledge of La Cosa Nostra (LCN) gambling activities, false auto accident claims, and influencing of players for the Philadelphia hock-

ey FLYERS team by himself and MER-LINO.

Based on the above request of GOLD-MAN, no FD–302 will be prepared of the 11/2/89, interview of BARON and the interview log, interview notes, and FD–395 will be placed in a 1–A envelope.

9. In the proffer session, Mr. Barone disclosed prior criminal activities, including his involvement with Pamela Jo Costello in the June, 1986 theft from the Golden Nugget Casino and in the November, 1985 theft from Harrah's (Trump Casino/Hotel).

10. Prior to November, 1989, both Barone and Costello had been identified as suspects in the 1985 and 1986 casino thefts, but the investigation by New Jersey authorities appears to have been dormant.

11. The otherwise unexplained reactivation of the New Jersey investigation of the casino thefts followed shortly after the time of Mr. Barone's debriefings by the FBI, and preceded his public testimony.

12. While Mr. Barone's guilty plea and cooperation with the government were publicly disclosed in court proceedings and in the press prior to his trial testimony, neither referred to Mr. Barone's involvement in the casino thefts.

13. At the time of signing the agreement and entering his guilty plea, Mr. Barone did not understand that the terms of the plea agreement did not afford him immunity, in the legal sense, from prosecution for other offenses disclosed.

14. Harvey Sernovitz, Esquire, Mr. Barone's retained attorney at the time, did not explain to Mr. Barone the distinctions between a non-prosecution agreement and a grant of immunity. Further, Mr. Sernovitz never considered Mr. Barone's risk of prosecution by the State of New Jersey as a result of his disclosures.

15. In connection with ascertaining the voluntariness of Mr. Barone's plea, this court did not determine that he understood the significance and limitations of the non-prosecution aspect of the plea agreement in any of the respects that have since become a problem. N.T. (Nov. 3, 1989), at 16. While the court discussed the provisions of the plea agreement with Mr. Barone, the court was not informed of the casino thefts and did not discuss possible state prosecution with him.

16. The FBI agents in Philadelphia who were privy to Mr. Barone's disclosures kept their fellow agents in southern New Jersey informed of the case developments. As a matter of FBI practice, neither in-person contacts nor telephone calls during which such information could have been disclosed are routinely recorded or filed, therefore, the absence of any note of a particular disclosure is not probative as to any dissemination of information revealed in a proffer session.

17. Through his contacts at the Linwood, New Jersey, FBI office, retired FBI agent Jack Tuttle, Director of Surveillance for Bally's Grand casino, successor to the Golden Nugget, made clear his interest in the Barone case and made inquiries about the federal prosecution from the time of Mr. Barone's arrest, long before his court testimony.

18. Around the second week of December, 1989 (after Mr. Barone's proffer and plea agreement, but *before* his testimony at the Merlino trial), Agent Rochon contacted Mr. Barone who was then living in protective custody and informed him that New Jersey authorities had wished to speak with him about the casino thefts, but that he (Rochon) had prevented them from speaking with Mr. Barone at that time.

19. At about the same time, Inspector Carl Gravel of the New Jersey Division of Criminal Justice, Casino Protections Section, contacted Mr. Tuttle and asked to review surveillance video tapes for the date of the Golden Nugget theft.

20. Shortly thereafter, Pamela Costello learned she was under investigation. She retained counsel (an attorney who had previously represented members of the Merlino family) and negotiated a deal with New Jersey authorities; she obtained immunity from prosecution and became the accusing witness against Mr. Barone in the casino cases.

21. The reactivation of casino theft investigations by New Jersey authorities occurred after Mr. Barone's proffer and plea agreement, but before his Merlino trial testimony or any public disclosure of his culpability.

22. On January 10, 1990, Mr. Barone testified against codefendant Joseph Merlino, in accordance with his plea agreement. Mr. Barone's attorney was not present. On cross-examination by counsel for Mr. Merlino, Mr. Barone was asked about one of the casino thefts. N.T. 5–6 (Jan. 10, 1990). The court did not advise Mr. Barone at that time (or at any other time) of his rights under the Fifth Amendment, and he answered the question, under oath, without understanding that he had no immunity.

23. Mr. Barone testified on cross-examination in open court: there is no evidence of record that his answer to the question about the casino theft was reported in the Philadelphia newspapers, nor that any New Jersey or casino official was present in court to hear that testimony. His admission would not have become known to them unless it were deliberately disclosed to them by a federal law enforcement officer or agent, either before or after the testimony, or by someone else present in court such as a member of the Merlino family.

24. Shortly after Mr. Barone's testimony admitting involvement in the Golden Nugget theft, Mr. Tuttle (of Bally's) received a telephone call from a federal law enforcement agent concerning this testimony. Tuttle shared this information with Inspector Gravel. Inspector Gravel's affidavit is too vague in certain relevant respects to have inherent credibility; he did not appear to testify at the recent hearings.

25. Assistant U.S. Attorney Robert E. Goldman told U.S. Probation Officer Jay Purcell, and Mr. Purcell stated in the Pre-Sentence Investigation Report that at some time between Mr. Barone's disclosures on November 2, 1989, and the April 10, 1990, preparation of the PSI, agents of the FBI notified officials of the Atlantic City casinos that Mr. Barone had admitted the casino thefts. The report states:

> The defendant also admitted to an incident that took place at the Golden Nugget Casino in Atlantic City, New Jersey, where he and a female identified as Pam Costello "scammed" this casino for approximately $40,000. He was never prosecuted but admitted to having been involved in "a few" scams during his lifetime. The prosecutor advised that the Federal Bureau of Investigation has notified the victims of these crimes and the defendant's admission of guilt.

(PSI, at 5).

26. At defendant's sentencing on April 18, 1990, AUSA Goldman stated on the record that he had read the Pre-Sentence Investigation Report and had no objections to the facts recited therein:

> THE COURT: First of all, Mr. Goldman, have you had an opportunity to study and consider the Pre-Sentence Report?
>
> MR. GOLDMAN: Yes, I have, your Honor.
>
> THE COURT: Do you have any objections to the facts that are stated therein?
>
> MR. GOLDMAN: No, your Honor.

27. Agent Rochon had contacts with federal and state authorities in New Jersey that he did not remember at the time of the recent hearing before this court, including the contact with New Jersey authorities in early December, 1989: Mr. Barone vividly recalled being told of this by Rochon.

28. Agent Basin's denial of New Jersey contacts in testimony at the hearing is not reliable evidence, because he failed to recall discussion of other crimes during Mr. Barone's debriefing, his presence in the courthouse during Mr. Barone's trial testimony, and his assistance in Mr. Barone's trial preparation.

29. According to a memorandum from Agent Rochon dated January 24, 1990:

> On 1/22/90, AUSA ROBERT GOLDMAN recommended to [Rochon] to provide information to the Philadelphia District Attorney's office on the shooting incidents involving ... RICHARD BARONE ... On 1/24/90, [Rochon] provided all necessary information about the shooting incidents [to the DA's office]. AUSA GOLDMAN has also been in con-

tact with [the DA's office] to advise cooperation in the event of local prosecution by the DA's office.

30. As the government points out, disclosure to victims of past criminal activity by a government cooperator is proper, so long as such disclosure is not a violation of a valid plea agreement. The government may determine in a particular case that the interests of justice are better served by not notifying victims that a perpetrator has been identified.

31. Because of the close relationship between the casino security departments and the Division of Gaming Enforcement of the State of New Jersey, disclosure of a serious crime against a casino to officials of the casino was likely to result in prosecution.

32. The federal agents involved in this case did not inform their colleagues in the New Jersey FBI office that the Government had promised not to bring further charges against Mr. Barone, and that nothing should be done to cause further charges against him in connection with matters he discussed during proffer sessions.

33. On November 9, 1990, while serving his sentence in this case, Mr. Barone was indicted in New Jersey Superior Court, Indictment No. 90–11–00151–S, and charged with 19 counts of conspiracy, theft, criminal coercion, extortion, terroristic threats, aggravated assault, kidnapping, criminal restraint, and aggravated sexual assault, based on testimony of Ms. Costello.

34. The charges now pending against Mr. Barone in Atlantic County, New Jersey, involve "conduct related to" the 1985 and 1986 casino thefts, within the meaning of Para. 6(c)(2)(e) of the plea agreement.

35. As a result of this indictment, Mr. Barone could not be released from federal confinement at the expiration of his sentence without losing the benefit of the Witness Protection Program, since it will not accept persons with open charges unless confined in prison.

36. As soon as his family could raise the necessary funds to post $50,000 bail,

Mr. Barone signed himself out of the protection program to participate in his own defense in New Jersey.

37. Mr. Barone fulfilled his obligations under the plea agreement.

38. After his 1989 proffer and before any public disclosure of Mr. Barone's admitted involvement in casino thefts in early 1990, New Jersey authorities inexplicably resumed an investigation into casino thefts occurring in 1985 and 1986. At that time, Mr. Barone's only admissions had been made privately to federal officials in connection with his plea agreement.

39. Defendant has shown by a preponderance of the evidence that agents of the FBI, intentionally or recklessly, indirectly violated the provisions of Mr. Barone's plea agreement that the government would bring no additional charges against him for matters disclosed during his proffer sessions, and that he would be allowed to apply for the federal witness protection program.

40. The court does not doubt AUSA Goldman's statements that he has no recollection of either his office or the FBI's contacting New Jersey officials prior to his representation to Mr. Purcell and affirmance at sentencing that the FBI had notified the victims of the casino crimes and Mr. Barone's admission of guilt; however, AUSA Goldman's statements to Mr. Purcell and his affirmance at sentencing were made much closer to the events when his recollection would have been more accurate. The FBI's record of AUSA Goldman's instructions to the FBI agents regarding providing information to the Philadelphia District Attorney also supports an inference that the presentence report was accurate and that FBI notification instigated the New Jersey prosecution of Mr. Barone. The court has conceded the possibility that Merlino's "family" instigated the prosecution out of spite, but considers it more likely that law enforcement officers would react to a tip from the FBI than the Cosa Nostra.

## CONCLUSIONS

1. Mr. Barone did not have the effective assistance of counsel in negotiating the terms of the plea agreement, in advising him of its significance, and in counseling him concerning the consequences of his non-immunized testimony under cross-examination.

2. Mr. Barone did not breach the plea agreement. Accordingly, under Fed. R.Crim.P. 11(e)(6) and Fed.R.Evid. 410, nothing he said during any proffer session prior to entering his plea is admissible against him in any court. Likewise, disclosure of such statements to state authorities indirectly violated his rights under these Federal rules.

3. As a result of the failure of his counsel to advise him, the breach of the agreement, and the failure of counsel and the court to protect Mr. Barone's privilege against self-incrimination, Mr. Barone's statements given under cross-examination were, in effect, involuntary.

4. Mr. Barone is entitled to be readmitted to the Witness Protection Program as soon as he again becomes eligible.

## DISCUSSION

■ When Richard Barone entered into his plea agreement with the United States Government in connection with his change of plea in this case, he acquired a right under the Due Process Clause of the Fifth Amendment to have that agreement strictly obeyed and enforced. *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *Patrick v. Camden County Prosecutor,* 630 F.2d 206, 208 (3d Cir.1980) (per curiam); *United States v. Miller,* 565 F.2d 1273 (3d Cir.1977), *cert. denied,* 436 U.S. 959, 98 S.Ct. 3076, 57 L.Ed.2d 1125 (1978). "In this circuit, 'the government must adhere strictly to the terms of the bargain it strikes with defendants.'" *United States v. Moscahlaidis,* 868 F.2d 1357, 1361 (3d Cir.1989), quoting *Miller,* at 1274. "[C]ourts are compelled to scrutinize closely the promise made by the government in order to determine whether it has been performed." *United States v. Hayes,* 946 F.2d 230, 233 (3d Cir.1991). A violation exists and requires a remedy even if it is "inadvertent." *Id., quoting United States v. Martin,* 788 F.2d 184, 187 (3d Cir.1986). If a violation is found, it is in the discretion of "the district court to either allow the [defendant] to withdraw his plea or grant specific performance of the plea agreement." *Moscahlaidis, supra; Patrick, supra.*

■ Paragraph 6(c)(2)(e) of the plea agreement in this case promised "that the government will bring no charges against the defendant for criminal conduct related to activity which he has disclosed during proffer sessions with federal agents prior to the entry of his guilty pleas." This is a promise not to prosecute; legally, it is not a grant of immunity. *United States v. Skalsky,* 857 F.2d 172 (3d Cir.1988) [1]; compare *United States v. Quatermain,* 613 F.2d 38, 39–41 (3d Cir.), *cert. denied,* 446 U.S. 954, 100 S.Ct. 2923, 64 L.Ed.2d 812 (1980). In the absence of such immunity, the rule of *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 84 S.Ct. 1594, 12 L.Ed.2d 678 (1964), did not directly bar derivative use of his testimony in state court. But, when Mr. Barone testified on cross-examination, he had a Fifth Amendment right to claim his privilege against self-incrimination about crimes other than that to which he had entered a plea of guilty. *See United States v. Frierson,* 945 F.2d 650, 656–57 (3d Cir.1991).

■ Since the Government cannot be permitted to accomplish indirectly what it is bound not to do directly, taking action likely to cause the State of New Jersey to bring charges against Mr. Barone the federal government would be barred from bringing, is a violation of the plea agreement, especially where the consequence of state charges is the loss of Mr. Barone's valuable placement in a witness protection program.

---

1. See also *United States v. Long,* 511 F.2d 878 (7th Cir.) (per Maris, J., sitting by designation), *cert. denied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975) (state's nonprosecution agreement did not bar subsequent federal prosecution on same evidence).

Where the motivation of one person to become a witness against another is the fruit or product of the latter's immunized testimony, evidence derived from the testimony of the former is barred. *United States v. Kurzer*, 534 F.2d 511 (2d Cir. 1976), *cited* in *Quatermain, supra.* Where the testimony of a witness derives from a violation of an agreement under which the defendant gave his cooperation and made statements incriminating to himself and others, that witness's testimony should be suppressed under *Santobello* as a remedy for the due process violation.

This court has the power to grant an effective remedy to protect Mr. Barone's rights under the plea agreement. That power might extend to enjoining state criminal prosecution in some cases. 28 U.S.C. § 2283; *Rowe v. Griffin*, 676 F.2d 524 (11th Cir.1982) (injunction against state murder prosecution, 15 years after the fact, of former FBI informant who had been promised immunity by both federal and state officials; affirmed). However, as a matter of comity and judicial discretion, this court will not enjoin the state proceeding without proof of bad faith or irreparable injury exceeding that attendant to every criminal prosecution; such proof is not in this record. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Perez v. Ledesma*, 401 U.S. 82, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (and cases following); *U.S. ex rel. Birnbaum v. Dolan*, 452 F.2d 1078 (3d Cir.1971); *Sole v. Grand Jurors*, 393 F.Supp. 1322 (D.N.J.1975) (Stern, J.).

This court may also grant mandatory relief against federal officers or officials even if it has the natural or intended effect of hampering a state prosecution derived from a violation of federal rights. *Rea v. United States*, 350 U.S. 214, 76 S.Ct. 292, 100 L.Ed. 233 (1956). Where achieving the precise relief bargained for by the defendant is not directly within the court's power, the court can direct federal officials who are within the jurisdiction of the court to do whatever is necessary to achieve specific performance to the extent possible. *See In re Geisser*, 554 F.2d 698 (5th Cir.

1977) (agreement to use best efforts to prevent defendant's extradition to Switzerland). This exercise of power to enforce a plea agreement may extend to requiring executive branch action a court might not ordinarily order, even where the original promise was not within the prosecutor's proper realm. *Palermo v. Warden*, 545 F.2d 286 (2d Cir.1976), *cert. dismissed*, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977) (court may order specific enforcement of plea agreement improperly promising parole release). In the present situation, the court is somewhat limited in an attempt to put Mr. Barone back where he would have been absent a violation.

Mr. Barone's rights under his plea agreement have been violated. Were this court not restrained by principles of comity and discretion, it would enjoin the New Jersey criminal prosecution against Mr. Barone, a remedy which the New Jersey court may certainly deem appropriate and within its power. Considering itself bound by such restraints, this court will direct the United States Attorney's Office and the Federal Bureau of Investigation to give no further assistance to the authorities of the State of New Jersey in their prosecution of Richard Barone, and direct the Department of Justice, including the United States Marshals Service, to make their best efforts to provide some form of witness protection at an appropriate time.

An Order follows.