**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 9 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

RAYMOND DEAN BROWN,

      Defendant-Appellant.

No. 03-8027

---

**Appeal from the United States District Court**
**for the District of Wyoming**
**(D.C. No. 00-CR-59-01-D)**

---

Howard A. Pincus, Assistant Federal Public Defender (Raymond P. Moore, Federal Public Defender, with him on the briefs), Denver, Colorado, for Defendant-Appellant.

David A. Kubichek, Assistant United States Attorney (Matthew H. Mead, United States Attorney, with him on the brief), Casper, Wyoming, for Plaintiff-Appellee.

---

Before **SEYMOUR**, **HOLLOWAY** and **MURPHY**, Circuit Judges.

---

**SEYMOUR**, Circuit Judge.

Raymond Dean Brown was convicted after a jury trial of being a felon in possession of a firearm, unlawfully possessing a machine gun, and carrying a machine gun during and in relation to a drug trafficking crime, in violation of 18 U.S.C. §§ 922, 924, and 18 U.S.C. § 2. He was sentenced to 115 months for the first two counts and 360 months for the third, to be served consecutively. On appeal, Mr. Brown asserts (1) there was insufficient evidence to convict him of carrying a machine gun during and in relation to the manufacture of methamphetamine; (2) the district court's jury instructions constructively amended the indictment to permit conviction for an uncharged crime of using a gun during and in relation to the underlying drug trafficking offense; (3) the court erroneously failed to suppress, or grant a hearing regarding, statements Mr. Brown made in exchange for an implicit immunity agreement with state authorities; (4) the court erred in leading potential jurors in the Pledge of Allegiance prior to the commencement of his trial; and (5) the court failed to consider Mr. Brown's challenge to various convictions listed in his presentence report. We affirm Mr. Brown's conviction and remand with directions that the district court vacate Mr. Brown's sentence and resentence him.

-2-

I.

Mr. Brown met Kirsten Lee Worrell in August 1999, in Missouri. As Ms. Worrell later testified at trial, shortly after they met Mr. Brown showed Ms. Worrell and others his machine gun and permitted them each to fire it. Mr. Brown also mixed and cooked materials to manufacture methamphetamine at or near the trailer Ms. Worrell shared with her former boyfriend, Ricky Huggins. The parties stipulated Mr. Brown used the "anhydrous ammonia method" to manufacture methamphetamine, which involves mixing ephedrine or pseudoephedrine tablets, lithium from batteries, and anhydrous ammonia with other materials.

Ms. Worrell, Mr. Huggins, Mr. Brown, and his girlfriend subsequently traveled to California. En route, the group stayed in a trailer owned by Mitchell Thomas, which was located near Rock Springs, Wyoming. Mr. Brown and his girlfriend eventually parted ways and he continued on the journey to California with Ms. Worrell and Mr. Huggins. At some point, Ms. Worrell and Mr. Huggins also parted ways. Mr. Brown ultimately traveled back to Rock Springs with Ms. Worrell. They arrived in Wyoming by the end of October 1999, and again stayed with Mr. Thomas in his trailer. Ms. Worrell testified that Mr. Brown manufactured methamphetamine in Mr. Thomas' trailer, which Mr. Thomas verified. Mr. Thomas also reported seeing Mr. Brown's machine gun sitting by

the back door of the trailer, near where Mr. Brown was cooking methamphetamine. Carmen Kittelson, an acquaintance of Mr. Thomas, testified that she visited the trailer once and discovered Mr. Brown sitting on the couch with the machine gun in his lap. Mr. Brown and Ms. Worrell eventually moved into a motor home owned by Mr. Thomas and relocated it to the nearby Flaming Gorge Reservoir area. Mr. Brown continued to manufacture methamphetamine in the motor home.

Ms. Worrell testified that Mr. Brown manufactured methamphetamine almost continuously from the time they returned to Wyoming at the end of October until they were arrested in mid-November. Ms. Worrell, Mr. Brown, and Mr. Thomas took road trips to gather supplies necessary for producing the methamphetamine, sometimes traveling out of state to collect materials. Ms. Worrell testified that Mr. Brown always had his gun with him during this time period.

While shopping for supplies at an Albertsons grocery store in Rock Springs on November 14, 1999, Mr. Brown and Ms. Worrell noticed police cars in the store parking lot. Although Mr. Brown's initial instinct was to escape via Albertsons' back exit, Ms. Worrell convinced him to return with her to her van. Once inside the van, they were surrounded by police, who were seeking Ms. Worrell on an outstanding arrest warrant. Detective Craig Jackson testified that,

during the police confrontation, he saw Mr. Brown repeatedly reach down between the seats where Mr. Brown's machine gun was later found in an unzipped bag and loaded with two magazines of bullets. Ms. Worrell testified that Mr. Brown had wanted to retrieve the gun and shoot his way out, but she convinced him otherwise and he surrendered.

Ms. Worrell was arrested, told the police about the methamphetamine manufacturing operation, and guided them to the motor home in Flaming Gorge. Mr. Brown was also arrested. While he was being questioned by the police, he tried to escape out of a window at the police office. He was captured after he hurt himself during the escape and was taken to the hospital, where a one-gram package of methamphetamine was recovered from his sock. Pursuant to a warrant, the police conducted a search of the Flaming Gorge location. They found coffee filters containing methamphetamine residue, acids and solvents commonly used during methamphetamine manufacture, and a fire pit containing several burned starter fluid cans and lithium battery wrappers. They also detected a strong smell of ether. Detective Jackson testified they found a cooler containing a biphase liquid, with chalky material at the bottom and clear fluid on top, that consisted of methamphetamine produced via the anhydrous ammonia method.

While state charges were pending, Mr. Brown and his lawyer met with a state prosecutor in February 2000 in order to determine whether Mr. Brown would

be given consideration for providing information. According to Special Agent Dennis Claman, the state prosecutor told Mr. Brown that although any information he provided would not be used against him in state court, the state could not bind federal authorities. Before Mr. Brown's attorney advised him to say nothing more about his gun, Mr. Brown provided information to the state agents about a man in Chicago who made and sold guns similar to the one he owned. Special Agent Claman later told federal agents Mr. Brown might have information of interest to them. On March 15, 2000, Mr. Brown pled guilty in Wyoming state court to possession of a controlled substance and operation of an unlawful clandestine laboratory. He received concurrent sentences of twelve months, and three to five years.

The week following his state proceedings, a federal grand jury returned an indictment charging Mr. Brown with three weapons offenses, spanning the time period of October 1999 through November 14, 1999. Mr. Brown moved to suppress the statements he made at the February 2000 meeting with the state prosecutor, arguing that the use of those statements would violate his Wyoming immunity agreement. The district court stated in a written order that it believed Mr. Brown understood the agreement did not apply to federal authorities, but reserved making a ruling until it heard testimony from the law enforcement personnel involved. Mr. Brown did not renew his suppression motion at trial and

the government presented his statements through the testimony of Special Agent Claman without any defense objection.

Before the commencement of Mr. Brown's trial, the district court asked the prospective jurors to join in reciting the Pledge of Allegiance. At the culmination of the proceedings, the court instructed the jury, without objection from the defense, that it could convict Mr. Brown if he "used or carried" a gun. The jury ultimately convicted Mr. Brown of all the charges against him.

Finally, before he was sentenced, Mr. Brown objected to the presentence report because, *inter alia*, he claimed that several convictions used to calculate his criminal history had been dismissed. Without addressing these objections, the district court sentenced Mr. Brown to 115 months for the first two counts and 360 months for the third count, to be served consecutively. Mr. Brown now appeals.

II.

Mr. Brown challenges the sufficiency of the evidence underlying his conviction for carrying a machine gun during and in relation to the manufacture of methamphetamine, in violation of 18 U.S.C. § 924(c). To support Mr. Brown's conviction under 18 U.S.C. § 924(c), the government had to prove beyond a reasonable doubt that (1) Mr. Brown committed the underlying drug offense, in this case "manufacturing methamphetamine," in violation of 21 U.S.C. §

841(a)(1); (2) he "carried" the machine gun; and (3) his carriage of the machine gun was "during and in relation to" his drug trafficking crime. 18 U.S.C. § 924(c).

We review the sufficiency of the evidence *de novo*. *United States v. Castorena-Jaime*, 285 F.3d 916, 933 (10th Cir. 2002). "'[W]e ask only whether taking the evidence–both direct and circumstantial, together with the reasonable inferences to be drawn therefrom–in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt.'" *United States v. Radcliff*, 331 F.3d 1153, 1157 (10th Cir. 2003) (quoting *United States v. McKissick*, 204 F.3d 1282, 1289 (10th Cir. 2000)). We do not assess the credibility of witnesses or weigh conflicting evidence since these tasks are exclusively those of the jury. *Castorena-Jaime*, 285 F.3d at 933. We may reverse "'only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Haslip*, 160 F.3d 649, 652 (10th Cir. 1998) (quoting *United States v. Wacker*, 72 F.3d 1453, 1462-63 (10th Cir. 1995)). This "standard requires this court to review the trial record to determine if there is evidence to support the verdict." *United States v. Austin*, 231 F.3d 1278, 1283 (10th Cir. 2000).

Mr. Brown has conceded the government proved he manufactured methamphetamine at Mr. Thomas' trailer and at his motor home. Aplt. Br. at 21,

23. Indeed, the evidence proving this fact was overwhelming.

First, the results of the police search executed on Mr. Thomas' motor home at the Flaming George Reservoir demonstrated the existence of an ongoing methamphetamine manufacturing operation. The police recovered coffee filters, acids, solvents, and fluid wrappers from lithium batteries, all of which are used in the methamphetamine manufacturing process. Most damaging, the officers located a batch of methamphetamine – the biphase liquid methamphetamine in the cooler – that was in the process of becoming the finished drug product. Second, Mr. Thomas testified he witnessed Mr. Brown manufacturing methamphetamine on several occasions. He also reported that he made road trips to the Flaming Gorge Reservoir to re-supply Mr. Brown with necessary supplies to continue his drug processing endeavor.

Finally, Ms. Worrell testified the methamphetamine manufacturing operation was constant and continuous from the time she and Mr. Brown returned to Rock Springs from California in late October until their arrest in November. According to Ms. Worrell, there was always some step in the manufacturing process taking place during this time period.

> Q [prosecutor]: How often would the defendant cook
> methamphetamine from the time you came back from California in
> approximately Halloween of 1999 to the time that you were arrested?
> A [Ms. Worrell]: There was usually something going the entire time.
> I mean, if it wasn't sitting – like you can have it sit, and it'll just like
> kind of cook itself a little bit. If it wasn't that, then there was stuff

drying out . . . there's always a step going on from that time until we got busted. . . .
Q: When you say "always a step going on," would you explain what you mean to the jury?
A: There's steps you have to take in order to - to manufacture methamphetamine, and it can take anywhere from a couple hours to do it to a couple days . . . . [T]here was always something going on. If it wasn't separating pills to get the ephedrine, it was mixing the lithium batteries in with the ephedrine and pouring the ether on it. There was always something happening, always.

Rec., vol. V, at 546-47. It is thus clear that Mr. Brown was manufacturing methamphetamine in violation of 21 U.S.C. § 841(a)(1).

Conviction under the "carry" prong of § 924(c) requires "possession of a firearm through dominion and control, and transportation or movement of the weapon." *United States v. Richardson*, 86 F.3d 1537, 1548 (10th Cir. 1996). Mr. Brown has conceded there was testimony he "carried" his machine gun on various occasions throughout the period alleged in the indictment. Aplt. Br. at 23-26. In fact, Mr. Brown admits he was "carrying" the gun within the meaning of § 924(c) in Ms. Worrell's van on the day of his arrest. Aplt. Br. at 26; *see also Muscarello v. United States*, 524 U.S. 125, 137-39 (1998) (carrying a firearm within the meaning of § 924(c) includes transporting it in a vehicle, even in a locked glove compartment or trunk). Again, Mr. Brown's concession is supported in the record by overwhelming evidence.

Mr. Brown was observed driving Ms. Worrell's van into the Albertsons' parking lot on the day of his arrest. Following Ms. Worrell's arrest, Mr. Brown's

loaded machine gun was discovered between the front seats of the van. As a result, there is no doubt Mr. Brown carried the machine gun within the meaning of § 924(c) on the day he was arrested.

In addition, Ms. Worrell's testimony demonstrated that no matter what Mr. Brown was doing, he always had the gun close at hand:

> Q [prosecutor]: Did he have the gun with him, by the way, the entire time from Missouri to Wyoming?
> A [Ms. Worrell]: Yes, he did.
> Q: Where was it?
> A: It was usually never too far from his reach. I mean, it's usually just like an arm's length away. . . .
> Q: Where was the machine gun, Government Exhibit Number 2, when you went to California?
> A: It was with Ray.
> Q: When you say "it was with Ray," can you describe where it was?
> A: Well, it was always in the black bag, and the black bag was always by the seat. If we were in the van, it was under his seat or on the seat next to him or somewhere really close to him. . . .
> Q: During . . . [the] two weeks from Halloween 1999 until November 14, 1999. Where was Government Exhibit Number 2, the gun?
> A: It was with Raymond.
> Q: When he was manufacturing methamphetamine out at the motor home, where was the gun?
> A: It was with Raymond.
> Q: Where?
> A: [I]t was pretty close to him. I mean, it was never pretty far from him. If he was back in the bathroom [manufacturing methamphetamine], it was back there with him.

Rec., vol. V, at 540, 543, 551. The general "carrying" prong of § 924(c) is unquestionably satisfied here.

Thus, the sole issue before us is whether the government proffered

sufficient evidence to prove Mr. Brown carried the machine gun "*during and in relation to*" manufacturing methamphetamine, as required by § 924(c). Mr. Brown argues that because he was not actually manufacturing methamphetamine in Ms. Worrell's van while he was "carrying" the machine gun, and he was not actually "carrying" the machine gun in Mr. Thomas' motor home or trailer when he was manufacturing methamphetamine, the government's evidence fails to establish the necessary nexus between his carriage of the weapon and the charged drug trafficking offense. We disagree.

A firearm is carried "during and in relation to" the underlying crime when the "defendant avail[s] himself of the weapon and . . . the weapon play[s] an integral role in the [underlying offense]." *United States v. Lampley*, 127 F.3d 1231, 1240 (10th Cir. 1997) (quotations omitted). The "during and in relation to" standard requires the government to prove a direct nexus between the defendant's carrying of a firearm and the underlying drug crime. *Id.* at 1240-41; *see also United States v. Iiland*, 254 F.3d 1264, 1274 (10th Cir. 2001) ("our cases make clear that the 'during and in relation to' requirement of section 924(c) necessitates some direct connection between the firearm and the drug offense"). To establish this nexus, we require evidence that the defendant intended the firearm to be available for use in the offense. *United States v. Shuler*, 181 F.3d 1188, 1190 (10th Cir. 1999) (quotation omitted). "There is no requirement, however, that the

drug trafficking crime be the sole reason for the possession of the gun." *United States v. Radcliff*, 331 F.3d 1153, 1158-59 (10th Cir. 2003) (citing *McKissick*, 204 F.3d at 1293-94).

Mr. Brown's first argument is that there was insufficient evidence to prove he was actually manufacturing methamphetamine while he admittedly was carrying the gun in Ms. Worrell's van. To support this contention, Mr. Brown notes that the term "manufacture," as defined by 21 U.S.C. § 802(15), does not include mere possession of ingredients that might be used to manufacture the controlled substance. In addition, Mr. Brown asserts Congress could not have intended that the mere possession of precursor materials be synonymous with "manufacture," or possession of precursor materials would not be a separately punishable offense. *See* 21 U.S.C. § 841(c)(2) (prohibiting possession of listed chemicals with intent to manufacture a controlled substance).

If Mr. Brown's underlying drug trafficking crime had constituted a "point-in-time" offense, such as the discrete distribution of a controlled substance, his argument might be persuasive. *United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999). As we detailed above, however, the evidence overwhelmingly established not only that Mr. Brown manufactured methamphetamine, but that Mr. Brown's methamphetamine manufacture was a continuous and ongoing operation from late October 1999 until the day of his arrest. The question before us then is

-13-

not whether the evidence demonstrates the machine gun was directly connected to any particular drug transaction or point in the methamphetamine production process, but whether the firearm was sufficiently connected to the "continuing offense" as a whole.

Supreme Court precedent is instructive on this point. In *Rodriguez-Moreno*, the Court was faced with the issue of the proper venue for a § 924(c) offense. 526 U.S. at 276. The defendant had kidnaped his victim in Texas and transported him to New Jersey and then to Maryland. *Id*. at 276-77. Once in Maryland, the defendant brandished a firearm during and in relation to the kidnaping. *Id*. at 277. The government conceded that there was no evidence the defendant used the gun in New Jersey. *Id*. at 281. Nonetheless, the trial was venued in New Jersey, and the defendant was convicted. *Id*. at 277. On appeal, the defendant argued that the proper venue for the § 924(c) violation was not New Jersey since he did not use the gun while committing a crime in that state. *Id*. at 281. The Supreme Court agreed that the venue should be based on where acts making up part of the crime took place, but ultimately ruled against the defendant. *Id*. at 281-82. The Court reasoned that the § 924(c) offense had two basic conduct elements: (1) "using and carrying" a gun, and (2) the underlying offense. *Id*. at 280. Section 924(c) could not be classified as a point-in-time offense where the underlying crime was a continuing offense. *Id*. at 281. The underlying crime

before the Court was a kidnaping, which continued until the victim was released. *Id.* Thus, venue of the § 924(c) offense was proper anywhere that a part of the kidnaping took place. *Id*. at 282.

Applying the tenets of *Rodriguez-Moreno*, we hold Mr. Brown "carried" the machine gun "during" his commission of the underlying crime, *i.e.*, manufacturing methamphetamine. The government presented overwhelming evidence that the methamphetamine manufacturing operation was ongoing and continuous from late October 1999 until Mr. Brown's November arrest. Thus, Mr. Brown's concession that he "carried" the machine gun within the meaning of § 924(c) on the day of his arrest alone forecloses any argument that the government failed to prove he carried a firearm "during" the manufacture of methamphetamine. Moreover, the evidence before the jury supported the inference that Mr. Brown also "carried" the gun throughout the period alleged in the indictment in connection with his road trips out of state to obtain anhydrous ammonia, and to Rock Springs for re-supply of ephedrine pills, lithium batters, starter fluid, and other such items. These trips occurred "during" the ongoing and underlying crime; indeed, they were essential to the maintenance of Mr. Brown's continuous methamphetamine manufacturing enterprise.

Mr. Brown further contends that even if the government did prove he "carried" a firearm "during" the commission of the drug trafficking crime, the

evidence was not sufficient to show that the firearm was carried "in relation to"

that crime. The Supreme Court has held that the phrase "in relation to"

> is expansive . . . . [A]t a minimum, [it] clarifies that the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence. As one court has observed, the "in relation to" language "allay[s] explicitly the concern that a person could be" punished under § 924(c)(1) for committing a drug trafficking offense "while in possession of a firearm" even though the firearm's presence is coincidental or entirely "unrelated" to the crime. Instead, the gun at least must "facilitate, or have the potential of facilitating," the drug trafficking offense.

*Smith v. United States*, 508 U.S. 223, 237-38 (1993) (citations omitted). We are

convinced this test is satisfied here.

"One recognized theory that explains how a gun facilitates a drug

trafficking crime is that the gun deters interference with the crime." *Radcliff*, 331

F.3d at 1159; *see also United States v. Lott*, 310 F.3d 1231, 1248 (10th Cir.

2002). This court has held that

> the placement of a loaded, semi-automatic weapon on the driver's seat of the car in which the instrumentalities of methamphetamine manufacturing were also found is sufficient evidence from which a jury could conclude that the purpose of the gun was to provide defense or deterrence in furtherance of attempting to manufacture methamphetamine.

*Lott*, 310 F.3d at 1248. In this case, Mr. Brown's loaded machine gun was found

by police in between the front seats of Ms. Worrell's van. Also found in the van

were various materials used in the manufacturing of methamphetamine, including

-16-

an anhydrous ammonia tank, recently purchased lithium batteries, and empty cans of starter fluid. Given the ongoing manufacturing process in which Mr. Brown was engaged, his carriage of the machine gun in between the front seats of a van in which the instrumentalities of methamphetamine manufacturing were also found is evidence from which a jury could conclude that the purpose of the gun was to provide defense or deterrence "in relation to" manufacturing methamphetamine.

Other facts also support a reasonable inference that Mr. Brown intended his weapon to deter interference with his methamphetamine manufacturing operation. For instance, Ms. Worrell testified Mr. Brown kept his machine gun by his side or within arms reach *at all times* when involved in manufacturing methamphetamine. Her statement was corroborated by Mr. Thomas, who testified that while Mr. Brown was cooking methamphetamine in the backroom of his trailer, he witnessed the machine gun propped against a door a mere two to three feet away from the defendant.

Moreover, the evidence concerning Mr. Brown's actions regarding the gun on the date of his arrest strongly supports the inference that he carried the weapon for defense and deterrence in relation to the underlying drug offense. Ms. Worrell testified that after she and Mr. Brown returned to her van in the Albertsons parking lot and were surrounded by police:

-17-

> Ray had the gun between the seats, and he said he was going to shoot at the cops and he was going to kill them all. And I just kept telling him, "No, no; you know, everything will be okay". . . . And he just kept going for the gun.

Rec., vol. V, at 557. A detective at the scene of the arrest reported he

> could see some type of commotion inside the vehicle. Mr. Brown is . . . looking around, trying to figure out where these officers are in exact relationship to where he's at. There's a conversation going on between Mr. Brown and Ms. Worrell inside the vehicle . . . his hands come down off of . . . the steering wheel down in between the seats. Something is going on down here on the floor. Then the hands come back up again.

Rec., vol. IV, at 242. This evidence demonstrates Mr. Brown had every intention of using his machine gun to prevent interference with his drug crimes and as a means of defense, particularly when confronted by law enforcement. For the foregoing reasons, we hold the evidence was sufficient to support Mr. Brown's § 924(c) conviction.

### III.

Raising an issue for the first time on appeal, Mr. Brown also contends the jury instructions constructively amended his indictment, possibly resulting in the jury convicting him on an uncharged crime. Mr. Brown was indicted for *carrying* a gun under § 924(c), but Instruction 34 directed the jury to convict him if he either *used or carried* a gun. It stated: "Mere possession of a machine gun is not a sufficient nexus or connection to establish guilt . . . the government must prove

-18-

. . . [that the defendant] *used or carried* a firearm." Rec., vol. VI, at 746

(emphasis added).

The instruction at issue was given to the jury in a series of instructions

related to the specific offense. First, the district court set forth the charge as

formulated in the indictment.[1] The court then gave Instruction 32, providing the

statutory definition of the offense, which included the phrase "uses or carries."[2]

It then gave Instruction 33, which defined one element of the offense as "the

defendant knowingly carried a firearm during and in relation to that crime."[3] *Id.*

---

[1]The court stated in full:

Count Three of the indictment charges that on or about October
1999, through and including November 14, 1999, in Sweetwater
County, in the District of Wyoming, the defendant, Raymond Dean
Brown, knowingly *carried* a firearm (sic); namely a Norinco MAK90
rifle, bearing Serial number 53438, during and in relation to a drug-
trafficking crime for which he may be prosecuted in a court in the
United States; that is, manufacturing methamphetamine.

Rec., vol. VI, at 745 (emphasis added).

[2]In full, Instruction 32 stated: "Section 924(c)(1) of Title 18 of the United
States Code provides, in pertinent part, that: . . . whoever, during and in relation
to any crime of violence or drug-trafficking crime, *uses or carries* a firearm shall
be guilty of an offense against the United States . . . ." Rec. vol. VI, at 745
(emphasis added).

[3]Instruction 33 stated in full:

In order to sustain its burden of proof for the crime of *carrying* a
firearm during and in relation to a drug-trafficking crime as charged
in Count Three of the indictment, the United States must prove the

(continued...)

at 745-46.  Finally, Instruction 34 concluded: "If the government does not prove beyond a reasonable doubt that the Defendant *possessed* the firearm during and in relation to a drug trafficking crime, you must find the Defendant not guilty of Count Three."[4]  *Id.* at 746 (emphasis added).

Because "using" a gun was not defined for the jury, Mr. Brown asserts the jury may have thought it was permissible to convict him for some activity other than carrying the gun, such as having the gun readily available, displaying it, or

---

[3](...continued)
following two essential elements beyond a reasonable doubt:
> One: That the defendant committed the crime of manufacturing a controlled substance; and
> Two: That the defendant knowingly *carried* a firearm during and in relation to that crime.

Rec., vol. VI, at 745 (emphasis added).

[4]The full text of Instruction 34 states:

> As to Count Three of the indictment, Title 18, United States Code, Section 924(c)(1)(B)(ii), reads: Mere possession of a machine gun is not a sufficient nexus or connection to establish guilt.  For you to find the defendant guilty of Count Three of the indictment, therefore, the government must prove beyond a reasonable doubt that the defendant, Raymond Dean Brown, *used or carried* a firearm and that the firearm played an integral role in the underlying offense by furthering the purpose or the effect of the underlying crime and that its presence or involvement was not the result of coincidence.  If the government does not prove beyond a reasonable doubt that the defendant *possessed* a firearm during and in relation to a drug-trafficking crime, you must find the defendant not guilty of Count Three.

Rec., vol. VI, at 745-46 (emphasis added).

brandishing it. He argues that this error requires an automatic reversal or at least constitutes plain error. The government concedes that the instructions are somewhat less than precise since they incorporate both the terms "use" and "possession" in addition to "carrying." Nonetheless, the government maintains that the instructions do not constitute plain error.[5]

An indictment is "constructively amended if the evidence presented at trial, together with the jury instructions, raises the possibility that the defendant was convicted of an offense other than that charged in the indictment." *United States v. Apodaca*, 843 F.2d 421, 428 (10th Cir. 1988) (citing *Stirone v. United States*, 361 U.S. 212, 215-19 (1960)). This doctrine is rooted in the Fifth Amendment right to be tried only for charges upon indictment by a grand jury. U.S. CONST. amend. V. Mr. Brown failed to object to the jury instructions or present the constructive amendment argument to the district court. We review claims of constructive amendment raised for the first time on appeal under the plain error

---

[5]The government also argues that Mr. Brown's counsel invited any error because he agreed to the "use or carry" language during a discussion about Instruction 34 with the district court and is therefore barred from challenging it on appeal. We disagree that defense counsel invited the addition of the word "use" in the jury instructions. The record demonstrates the discussion was focused on other language in the instruction at the time the "use or carry" phrase was erroneously inserted. There is neither evidence of inducement of the district court, *United States v. Johnson*, 183 F.3d 1175, 1179 n.2 (10th Cir. 1999), nor a stipulated agreement by defense counsel, *Quigley v. Rosenthal*, 327 F.3d 1044, 1064-65 (10th Cir. 2003), to add the "use or carry" language. Indeed, the error appears to be inadvertent.

standard.  *United States v. Cavely*, 318 F.3d 987, 999 (10th Cir. 2003).[6]  Under a

plain error review, reversal is only warranted if there is: (1) an error; (2) that is

plain; (3) that affects substantial rights; and (4) that seriously affects the fairness,

integrity, or public reputation of judicial proceedings.  *United States v. Olano*,

507 U.S. 725, 732 (1993).  There is little doubt Mr. Brown can satisfy the first

two prongs of the plain error analysis, and we need not decide whether he can

---

[6]Tenth Circuit precedent establishes some uncertainty as to whether a constructive amendment of an indictment by jury instructions to which the defendant did not object is reversible *per se* or reversible only where the amendment constitutes plain error and seriously affects the fairness, integrity or public reputation of judicial proceedings.  *Compare United States v. Levine*, 41 F.3d 607, 617 n.13 (10th Cir. 1994) (reversible *per se*) *with United States v. Cavely*, 318 F.3d 987, 999 (10th Cir. 2003) (applying plain error standard without citing *Levine*).  After *Levine* but before *Cavely*, the Supreme Court decided *United States v. Cotton*, 535 U.S. 625 (2002).  In *Cotton*, the Court declined to notice plain error in a situation where the indictment lacked any reference to threshold drug quantities, a defect of constitutional magnitude after *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  *See id*. at 627-28.  The indictment alone would have yielded a maximum sentence of twenty years, yet the defendants were sentenced to at least ten years above the maximum due to the district court's finding of 500 or more grams of cocaine base.  *Id*.  Because the defendants had not objected below, the Court engaged in plain error review.  *Id*. at 631 (distinguishing *Stirone v. United States*, 361 U.S. 212 (1960), on basis that constructive amendment claim there was raised in district court); *see also* 3 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE: CRIMINAL 3D § 516 at 51 & n.16.  Although there was constitutional error that was plain and resulted in substantially increased sentences for the defendants, the Court upheld the sentences because the uncharged drug quantity was supported by overwhelming and uncontroverted evidence.  *Cotton*, 535 U.S. at 634.  The Court ruled the "fairness, integrity and public reputation of judicial proceedings" would be threatened if the sentence were overturned.  *Id*.  It is clear, therefore, that the automatic reversal rule of *Levine* no longer applies in a constructive amendment plain error case, *ie.*, where the defendant failed to object in the district court.

satisfy the third prong because the fourth prong is dispositive. *United States v. Cotton*, 535 U.S. 625, 632-33 (2002) ("[W]e need not resolve . . . [the third prong of the plain error review], because even assuming respondents' substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings); *Johnson v. United States*, 520 U.S. 461, 469-70 (1997) (same).

In *Johnson* and *Cotton*, the fourth prong of plain error review was interpreted to prohibit recognition of plain error when evidence of a defendant's guilt on the *charged crime* is "overwhelming" and "essentially uncontroverted." *See Johnson*, 520 U.S. at 469-70 (finding that error did not satisfy the fourth prong); *see also Cotton*, 535 U.S. at 633-34 (same).[7] Therefore, if overwhelming

---

[7]The crime charged in *Johnson* was violation of 18 U.S.C. § 1623, which proscribes "knowingly mak[ing] any false material declaration" under oath before a grand jury. *Johnson v. United States*, 520 U.S. 461, 461 (1997). The error in *Johnson* was the district court's failure to submit *an element of the offense*, materiality, to the petit jury. *Id*. at 465. Because the evidence of materiality was "overwhelming" and "essentially uncontroverted" at trial, the Court held that there was "no basis for concluding that the error 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings.'" *Id*. at 469-70. The crime charged in *Cotton* was conspiracy to distribute and to possess with intent to distribute a "detectable amount" of cocaine and cocaine base. *Cotton v. United States*, 535 U.S. 625, 627-28 (2002). The error in *Cotton* was the omission of drug quantity, *an element of a § 841(b) offense*, from the indictment. *Id*. at 628. The evidence on the record that the conspiracy involved at least 50 grams of cocaine base was "overwhelming" and "essentially uncontroverted," *id*. at 633, and the Court therefore held the error did not seriously affect the fairness, integrity or public reputation of judicial proceedings. *Id*.

and essentially uncontroverted evidence exists in the record to support Mr. Brown's guilt on the *charged crime* of carrying a gun under § 924(c), the alleged constructive amendment cannot satisfy the fourth prong of plain error review. As detailed earlier in this opinion, after a comprehensive review of the record, we are confident the government introduced overwhelming and essentially uncontroverted evidence proving Mr. Brown carried his gun during and in relation to the underlying drug offense, *i.e.*, manufacturing methamphetamine.[8] "In light of this evidence, the proceedings resulted in a 'fair and reliable determination' of [Mr. Brown's] guilt and, even assuming plain error, a reversal would be unwarranted." *United States v. Fabiano*, 169 F.3d 1299, 1305 (10th Cir. 1999). Indeed, because of the overwhelming and uncontroverted evidence in this case, "the fairness, integrity, or reputation of the judicial proceedings would" be threatened if we vacated Mr. Brown's § 924(c) conviction. *Cotton*, 535 U.S. at 634 (internal quotation omitted). Therefore, we hold Mr. Brown's alleged

---

[8]We note there is also overwhelming evidence that Mr. Brown "used" his gun. "Use" of a gun requires actual employment and can involve displaying or brandishing it. *United States v. Bailey*, 516 U.S. 137, 143, 148 (1995). Mr. Brown's carriage of the gun in this case involved actively displaying or brandishing it, since it was visible to others and since the evidence indicates his purpose was to employ the gun for deterrence and defense. Moreover, Mr. Brown's contention that he might have been convicted for merely having the gun readily available, which is not necessarily a crime under *Bailey*, *see* 516 U.S. at 149, is unavailing in light of the overwhelming evidence of the greater offenses of both using and carrying the gun.

constructive amendment does not warrant reversal.

IV.

Mr. Brown next claims the district court should have suppressed statements that he made to Wyoming state authorities on February 3, 2000, and should have held a hearing on the derivative use of the statements. He maintains that state authorities implicitly promised, in exchange for his providing information, not to facilitate other jurisdictions in using the statements against him. He claims that the state nevertheless passed along his statements to federal authorities, and that they essentially formed the basis of federal charges against him. Mr. Brown claims Special Agent Claman's recounting of his statements at trial helped prove Mr. Brown knew the gun was a machine gun for the purpose of 18 U.S.C. § 922.[9] Although Mr. Brown filed a motion to suppress the statements, the district court reserved making a ruling and Mr. Brown did not renew the motion at trial or object to the introduction of the statements. We therefore engage in plain error review.

An exhibit filed by the government in response to Mr. Brown's motion to

---

[9]Knowledge that a gun is a machine gun is not an element of the third count against Mr. Brown for carrying a gun during and in relation to a drug trafficking crime. *See United States v. Eads*, 191 F.3d 1206, 1212-14 (10th Cir. 1999) (stating that type of firearm carried is not an element of § 924 offense, but a sentencing factor).

suppress included a report by Special Agent Claman, who was present during Mr.

Brown's discussion with the state. The report noted Mr. Brown was informed that

the purpose of the discussion was to assess what consideration he would be

provided in exchange for his information, and that:

> DCA [Deputy County and Prosecuting Attorney] Howard advised
> BROWN that information provided would not be used against him in
> state court proceedings. DCA Howard specifically stated that the
> terms of the proffer/interview were not binding on federal authorities
> nor authorities in any other state. DCA Howard further stated he had
> no authority to grant immunity in any charges that may be brought by
> federal authorities or authorities in any other state. DCA Howard did
> state that any state crimes that BROWN admitted to would not be
> prosecuted with the exception of any crimes of violence.

Rec., vol. I, doc. 104, ex. 2 at 32-33. During Mr. Brown's plea discussion in state

court, the parties engaged in the following dialogue with the court:

> MR. PROKOS [prosecutor]: While under Wyoming law, your Honor,
> we can't specifically grant immunity, there – there was an agreement
> that we would not prosecute for any acts or wrongs that is use or
> derivative use of immunity that Mr. Brown testif[ied] to during his
> proffer or provided information regarding during his proffer. We
> won't prosecute him for any of those acts that he's admitted to.
> COURT: Is he facing any federal charges?
> MR. NELSON [defense counsel]: . . . we've had the matter for four
> months, and none have come forward, but he certainly could be
> charged federally . . . .
> COURT: Mr. Brown, is this your understanding of the plea
> agreement?
> DEFENDANT: Yes, Your Honor, it is.

*Id.*, ex. 5 at 5.

The record thus demonstrates the state prosecutor told Mr. Brown that any

information he provided would not be used in state proceedings in Wyoming, and that Mr. Brown would not receive protection from federal charges. Mr. Brown expressly acknowledged that he understood these terms. His theory that the state's active role in passing along information in the face of its informal immunity agreement with him constitutes a violation of the plea agreement is not persuasive; here, disclaimers about the lack of federal immunity were clearly provided and Mr. Brown stated his understanding of such.[10] The district court therefore did not err by permitting testimony regarding the relevant conversation or by failing to grant a hearing regarding its derivative use.

V.

Mr. Brown argues the district court's decision to lead prospective jurors in the Pledge of Allegiance, with its recitation of loyalty to the "flag of the United States of America and the Republic for which it stands," caused the jury to favor the prosecution. He claims that directly after the pledge was recited, the district court called the case and asked if the "United States of America" was ready to

---

[10]Mr. Brown's reliance on *United States v. Barone*, 781 F. Supp. 1072 (E.D. Pa. 1991), does not help him. In *Barone*, the defendant's nonprosecution agreement with federal authorities was violated by their assistance in a state prosecution because the court found that the defendant was not warned of his lack of state immunity by his attorney or the court and that he did not understand he could still be subject to charges in other jurisdictions. 781 F. Supp. at 1075, 1078.

proceed. Rec., vol. III, at 5. Mr. Brown acknowledges that we ruled in *United States v. Wonschik*, 353 F.3d 1192, 1198-99 (10th Cir. 2004), that such a claim is without merit because a jury's pledge of fealty to the Constitution and our laws "could just as likely benefit a defendant as to prejudice him." He nonetheless advocates we depart from *Wonschick* and rule in his favor. However, because one panel of this court cannot overrule another, *United States v. Lopez*, 327 F.3d 1207, 1212 n.6 (10th Cir. 2004), Mr. Brown cannot succeed on this claim.

VI.

Mr. Brown's final contention is the district court erred, under FED. R. CRIM. P. 32(i)(3), in accepting the presentence report's assessment of his criminal record without ruling on his objections that some of his prior charges had in fact been dismissed. The sentencing transcript nowhere shows that the district court weighed these objections or sought further hearings regarding them. The government agrees the district court should have resolved Mr. Brown's objections before sentencing him and that this case should be remanded for resentencing. Since the disputed charges could result in a reduction of Mr. Brown's criminal history category, and thus his sentence, we agree that remand is appropriate.

## VII.

For the reasons stated above, we **AFFIRM** Mr. Brown's conviction but **REVERSE** and **REMAND** the case for resentencing.