**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 28, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

FREDY FABIAN
MARQUEZ-MADRID, also known as
Fredy Marquez Fabian,

Defendant-Appellant.

No. 07-5024
(D.C. No. 06-CR-130-K)
(N.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **PORFILIO**, **ANDERSON**, and **BALDOCK**, Circuit Judges.

Fredy Fabian Marquez-Madrid appeals the district court's denial of his
motion for acquittal on the two charges against him, one count of possessing 100
kilograms or more of marijuana with intent to distribute in violation of 21 U.S.C.
§§ 841(a)(1) & (b)(1)(B)(vii) and one count of using or carrying a firearm during

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel.  It may be cited, however, for its persuasive value consistent
with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

and in relation to a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1). We have jurisdiction to hear this direct criminal appeal under 28 U.S.C. § 1291, and we AFFIRM.

## I.

Mr. Marquez-Madrid was tried before a jury, which heard testimony from four witnesses: Sean Larkin, a patrol supervisor with the Tulsa Police Department; Jeff Henderson and Frank Khalil, officers with the Tulsa Police Department; and Mr. Marquez-Madrid.

Sergeant Larkin testified that on May 26, 2006, he, along with other officers, participated in a police visit to a house in Tulsa. As he approached the front door, he could see through the front window and observed two Hispanic males, one of whom was Mr. Marquez-Madrid, sitting on the couch drinking beer. Sergeant Larkin could also see through the living room into the kitchen, where he observed "two brown packages that were cut open as well as numerous boxes containing various Ziploc-size baggies." App., Vol. V, at 10. He testified that in his experience, such materials were a common means of packaging narcotics for distribution. As it turned out, the package wrappings were plastic sealed with brown tape and clear tape, with air fresheners on the inside. The sergeant also testified that air fresheners and fabric softeners commonly are used to try to disguise the odor of marijuana.

When the officers knocked on the door, Mr. Marquez-Madrid disappeared from sight, and after a delay, the other man, Juan Lujano, opened the door. When the door opened, Sergeant Larkin noticed a very strong odor of marijuana. Mr. Lujano consented to allow the police officers to enter the house. The officers walked through the house to ensure that no one else was present. In a bedroom just beyond the hall bathroom, they saw large plastic totes or storage bins and a plastic garbage can containing wrapped bricks of marijuana in packaging identical to the materials on the kitchen table, Ziploc bags containing marijuana, and a digital scale. The door to the bedroom from the hall was open. The house had no television (or at least not one that was on), no radio, no food but several drinks in the refrigerator, and little signs of occupancy beyond a small amount of female clothing in one bedroom; in light of these factors, in Sergeant Larkin's experience, the house was a "stash house," a house used solely for storing drugs. The marijuana that was recovered weighed more than 220 pounds (100 kilograms), probably worth more than $350,000 when broken down into one-ounce increments and sold on the street.

Officer Henderson accompanied Sergeant Larkin to the front door when the officers arrived at the house. Like Sergeant Larkin, he saw two Hispanic males sitting on the couch drinking beer. He testified that when the officers knocked, one male came toward the door and the other (Mr. Marquez-Madrid) disappeared. Officer Henderson and another officer went around the back of the house to see if

Mr. Marquez-Madrid was leaving out the back. They saw Mr. Marquez-Madrid on the back porch, walking away from them. They called to him. He continued to walk for a few feet, then made a throwing motion and turned back toward the officers. When Officer Henderson asked to see his hands, he continued to walk toward the back fence.

The officers subdued and secured Mr. Marquez-Madrid and spoke to the officers in the house. At that point, Officer Henderson smelled marijuana through the open sliding glass door at the back of the house. After the officers brought Mr. Marquez-Madrid into the house, Officer Henderson saw the marijuana in the bedroom. He told Sergeant Larkin about Mr. Marquez-Madrid's actions in the backyard and the two officers went to search the area where Mr. Marquez-Madrid had been. They discovered two loaded firearms lying on the grass. After entering a stipulation that a government chemist, if called, would confirm that the substance found in the house was marijuana, the government rested its case.

Mr. Marquez-Madrid testified in his defense that he was a farmer from Mexico. He was asked by Carlos Rascon to pick up a car from Juan Lujano in Tulsa and drive it back to Mexico. Mr. Lujano picked up Mr. Marquez-Madrid from the bus station early in the afternoon, they ate, drove around the city, then went to the house, where they drank some beer. Mr. Marquez-Madrid testified that he did not know there were drugs in the house and he did not see the marijuana. He saw the guns, because Mr. Lujano was showing them off, and he

touched them. When the officers knocked, Mr. Lujano told Mr. Marquez-Madrid to get the guns out of there, and so he took them and threw them out in the backyard. He did not understand what the officers in the back yard were saying to him, as he did not speak English. On cross-examination, he admitted that he had not previously told officers parts of the story that he related on the stand, and he testified that he did not smell the marijuana in the house. On redirect-examination, he testified that he spent most of his time at the house in the living room and he did not ask Mr. Lujano if he could look in the other rooms because it would have been rude.

Officer Khalil testified that he spoke Spanish and he questioned Mr. Lujano, who told the officer that he had been living at the house for eight days because he was hired to protect the marijuana. Mr. Lujano also told Officer Khalil that Mr. Marquez-Madrid had arrived only that day and that he was there to pick up a car and drive it to Mexico. Officer Khalil further testified that when he interviewed Mr. Marquez-Madrid, the defendant never mentioned Carlos Rascon, but said that he was hired to pick up the car by Juan Lujano, whom he met through Mr. Lujano's girlfriend. On redirect-examination, Officer Khalil admitted that Mr. Lujano had not said anything to implicate Mr. Marquez-Madrid in dealing marijuana.

The district court denied Mr. Marquez-Madrid's motion for acquittal on both counts of the indictment. The jury found him guilty on both counts, and the

district court sentenced him to consecutive sentences of 63 months of imprisonment on Count One and 60 months on Count Two. Mr. Marquez-Madrid appeals the district court's denial of the motion for acquittal.

## II.

The standard for reviewing a denial of a motion for acquittal is well-established: "we review the record de novo to determine whether, viewing the evidence in the light most favorable to the government, a reasonable jury could have found the defendant guilty of the crime beyond a reasonable doubt." *United States v. Harris*, 369 F.3d 1157, 1163 (10th Cir. 2004) (quotation omitted). "In conducting our inquiry, we do not weigh conflicting evidence nor consider the credibility of witnesses." *United States v. Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004). "Instead, we must simply determine whether the evidence, if believed, would establish each element of the crime." *Id.* (quotation and alteration omitted). Because Mr. Marquez-Madrid presented his case after moving for acquittal, we review the entire record on appeal, not only the government's case. *Id.* at 1082.

### *21 U.S.C. §§ 841(a)(1) & (b)(1)(B)(vii)*

There are three elements the government must establish to obtain a conviction for possessing a controlled substance with intent to distribute in violation of 21 U.S.C. § 841(a)(1). The first element is that the defendant possessed a controlled substance; the second is that the defendant knew he

possessed the controlled substance; and the third is that he intended to distribute the controlled substance. *Harris*, 369 F.3d at 1163. "Possession may be actual or constructive." *Id.* (quotation omitted). "To prove constructive possession, the Government must show that Defendant knowingly held ownership, dominion or control over the object and premises where the contraband was found." *Id.* (quotation omitted). Where the location of the narcotics is jointly occupied, "the government must present direct or circumstantial evidence to show some connection or nexus individually linking the defendant to the contraband." *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998). There must be "some evidence supporting at least a plausible inference that the defendant had knowledge of and access to the contraband." *Id.* (alteration and quotation omitted).

Mr. Marquez-Madrid argues that there was insufficient evidence that he possessed the marijuana because he did not know about the marijuana and he had no dominion or control over the house. Mr. Marquez-Madrid's arguments, however, rest on the assumption that the jury should have believed his testimony. The jury was not obligated to do so. *See United States v. Triana*, 477 F.3d 1189, 1195 (10th Cir.), *cert. denied*, 127 S. Ct. 2928 (2007). The three police officers testified to the extremely strong odor of marijuana that immediately struck them from the open doorways of the house. Sergeant Larkin testified that more than 220 pounds of marijuana was located in an easily accessible bedroom with

its door open to the hallway.  A reasonable jury could find that an occupant

of the house knew of the presence of large amounts of marijuana and that

Mr. Marquez-Madrid had access to the marijuana.  We "accept the jury's

resolution of the evidence as long as it is within the bounds of reason." *See*

*United States v. Cui Qin Zhang*, 458 F.3d 1126, 1128 (10th Cir. 2006),

*cert. denied*, 127 S. Ct. 1165 (2007) (emphasis and quotation omitted).

Mr. Marquez-Madrid also contends that there was insufficient evidence of

his (as distinguished from Mr. Lujano's or others') intent to distribute.  This court

has held that "a jury may infer intent to distribute from the possession of large

quantities of drugs." *United States v. Pulido-Jacobo*, 377 F.3d 1124, 1131

(10th Cir. 2004).  Further, the officers testified that the circumstances – including

the amount of marijuana, the indicia of a "stash house," and the packaging

supplies – were consistent with distribution.  Mr. Marquez-Madrid's contentions

again assume that the jury was required to believe his testimony, but it was not.

The district court did not err in denying the motion for acquittal on Count One.

### *18 U.S.C. § 924(c)(1)*

There are also three elements that the government must establish to support

a conviction for using or carrying a firearm during and in relation to a drug

trafficking crime in violation of 18 U.S.C. § 924(c)(1).  The first element is that

the defendant committed a drug trafficking crime; the second is that the defendant

knowingly "used" or "carried" a firearm; and the third is that the firearm was

"used" or "carried" "during and in relation to" the drug trafficking crime.[1] *See*

*United States v. McKissick*, 204 F.3d 1282, 1292 (10th Cir. 2000).

Mr. Marquez-Madrid first argues that there is no evidence of the "use" or

"carrying" of the firearms to satisfy the second element. We need not consider

his argument about whether he "used" the firearms, because there is sufficient

evidence that he "carried" the firearms. *See United States v. Powell*,

226 F.3d 1181, 1192 n.4 (10th Cir. 2000) ("[A] crime denounced in the statute

disjunctively may be alleged in an indictment in the conjunctive, and thereafter

proven in the disjunctive.") (quotation omitted). "Conviction under the 'carry'

prong of § 924(c) requires possession of a firearm through dominion and control,

and transportation or movement of the weapon." *United States v. Brown*,

400 F.3d 1242, 1248 (10th Cir. 2005) (quotation omitted). Mr. Marquez-Madrid

admitted that he handled the firearms in the house, and when the police knocked

on the door and Mr. Lujano told him to get rid of the guns, he picked them up,

took them outside, and threw them in the yard. This evidence shows dominion,

control, and transportation, and thus supports a finding that Mr. Marquez-Madrid

"carried" the firearms as required by § 924(c)(1)'s second element.

---

[1]     Section 924(c)(1) also addresses the possession of a firearm "in furtherance of" a crime of violence or drug-trafficking crime. The government chose to prosecute Mr. Marquez-Madrid only under § 924(c)(1)'s "use or carry" prong, not the "possession" prong.

Mr. Marquez-Madrid also contends there is no evidence that the firearms were used or carried "during and in relation to a drug trafficking crime" to satisfy the third element. He points out that no drug transactions occurred while he was in the house and that there was no evidence he "was protecting the marijuana, planned to conduct transactions with the marijuana, or even knew about the marijuana." Aplt. Br. at 28. In *Smith v. United States*, 508 U.S. 223, 237-38 (1993), the Supreme Court held that although "in relation to" is expansive, it requires at a minimum that "the firearm must have some purpose or effect with respect to the drug trafficking offense; its presence or involvement cannot be the result of accident or coincidence." This court has held that "a firearm is carried during and in relation to the underlying crime when the defendant avails himself of the weapon and the weapon plays an integral role in the underlying offense." *United States v. Banks*, 451 F.3d 721, 726 (10th Cir. 2006) (quotations and alterations omitted). "This standard requires the government to prove a direct nexus between the defendant's carrying of a firearm and the underlying drug crime. For this nexus to be established, evidence must demonstrate that the defendant intended the firearm to be available for use in the offense." *Id.* (quotation and citation omitted).

The evidence was sufficient to support a finding that Mr. Marquez-Madrid carried the guns "during and in relation to a drug trafficking crime." The underlying crime was possession with intent to distribute, which continued until

Mr. Marquez-Madrid no longer had possession of the narcotics. Thus, it is not determinative that no particular retail drug transaction occurred that night. *See Brown*, 400 F.3d at 1249-50 (holding that where defendant was engaged in a continuing and ongoing methamphetamine manufacturing operation, the question before the court was "whether the firearm was sufficiently connected to the 'continuing offense' as a whole"). The jury was entitled to conclude that the guns were present in the house for the protection of the marijuana; Officer Khalil testified about Mr. Lujano's statements to that effect, and Sergeant Larkin testified that guns commonly are used to protect drug shipments. *See also United States v. Williams*, 923 F.2d 1397, 1403 (10th Cir. 1990) ("[T]he firearms were entwined with the drug operation. The success of such a retail distribution operation is predicated upon a steady flow of customers making purchases. The visible presence of firearms is a means of ensuring that none of these customers attempts a robbery."). Unlike in *United States v. Matthews*, 942 F.2d 779, 783 (10th Cir. 1991), in this case there was evidence that Mr. Marquez-Madrid availed himself of the firearms. By his own admission, when the officers knocked and announced their presence, Mr. Marquez-Madrid picked up the guns, took them outside, and tried to get rid of them by tossing them into the backyard. As with Count One, the jury was entitled to disbelieve Mr. Marquez-Madrid's testimony and draw its own inferences from the evidence. The district court did not err in denying the motion for acquittal on Count Two.

III.

We must decline Mr. Marquez-Madrid's invitations to re-weigh the credibility of the witnesses and reconsider the inferences the jury gleaned from the evidence. The judgment of the district court is AFFIRMED.

Entered for the Court


Stephen H. Anderson
Circuit Judge